# 57 Elmhurst LLC v Tamay

2025 NY Slip Op 32868(U)

August 19, 2025

Civil Court of the City of New York, Queens County

Docket Number: Index No. L&T 0055529/2020

Judge: Clinton J. Guthrie

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF QUEENS: HOUSING PART B
-----------------------------------------------------------------X
57 ELMHURST LLC,                                             Index No. L&T 55529/20

                      Petitioner,

           -against-                              **DECISION/ORDER AFTER
                                              TRIAL UPON
JESUS PEREZ TAMAY, ELSA MARIA TAMAY,   COUNTERCLAIMS**
JOHN DOE, JANE DOE, CARLOS FLORES,
BLANCA REMACHE, JUAN CARLOS FLORES,
CHELSEA MICHELLE FLORES, LUIS FLORES,

                      Respondents.
-----------------------------------------------------------------X
Present:

        Hon. <u>CLINTON J. GUTHRIE</u>
            Judge, Housing Court

The Decision/Order after trial on respondent Elsa Maria Tamay's counterclaims is as follows.

<u>PROCEDURAL HISTORY</u>

This summary nonpayment proceeding was commenced in 2020. After various stays occasioned by the COVID-19 pandemic and further proceedings, a trial on petitioner's claims commenced before this court on September 11, 2023. Petitioner rested on its prima facie case on May 15, 2024. Respondents' attorneys made an oral motion to dismiss at the close of petitioner's prima facie case.[1] By Decision/Order dated June 12, 2024, the court granted the oral motion and dismissed the petition (*see 57 Elmhurst LLC v Tamay*, 2024 NY Slip Op 32092[U] [Civ Ct, Queens County 2024]). The proceeding was restored for a trial on respondent's counterclaims. The trial on the counterclaims commenced on June 12, 2024 and concluded on September 17, 2024. After submission of post-trial memoranda, decision was reserved on November 27, 2024.

---

[1] The Legal Aid Society represents Elsa Tamay and Jesus Tamay.

[* 1]

COUNTERCLAIMS TRIAL

The court first took judicial notice of Rent Guidelines Board Orders #48, 49, and 51. The court also admitted into evidence current DHPD (Department of Housing Preservation and Development) open violations for the subject premises (and took judicial notice of the same pursuant to Multiple Dwelling Law § 328(3)), as well as certified DHCR (Division of Homes and Community Renewal) records that were produced pursuant to subpoena. After a certification was procured, Citibank checking records for Jesus Tamay were also admitted.

Jesus Tamay was respondents' sole witness. He testified as follows. He had lived in Apartment 2U in the subject building since April 20, 2017. He lived there with his wife, daughter, and grandchildren. His first rent was $3,000.00 per month. He paid rent by money order initially. He had two (2) leases at the subject premises. He paid rent from the time that he moved in until March 2020.

Mr. Tamay next testified about several conditions in the subject premises. The first involved windows throughout the apartment that did not close properly. The condition began in December 2017 and caused the apartment to become very cold. He stated that he called Zara Realty (petitioner's parent company) 2-3 times a day about the condition. He was told that they would send someone, but no one came. The condition persisted and caused the apartment to become cold again the next winter, in 2018. He had to put tape over all the windows to better seal them. The condition continued through the time of the trial and the windows continued to be taped up.

The next condition Mr. Tamay described was humidity in the kitchen and related damage to the kitchen floor. He stated that there was a DHPD violation related to the floor. He

2

[* 2]

described the floor as "rotted" and "dirty." He called Zara Realty about the condition but stated that they did not respond to him or send anyone to look at the kitchen floor.

The next condition involved a leak in the bathroom. After the leak was fixed, he noticed "black stuff" growing in the bathroom. He called the superintendent about this. The superintendent cleaned the black substance and painted in the bathroom. After one week, the black substance returned. He believed the substance was mold, which lasted for around three (3) months.

Mr. Tamay also described the presence of cockroaches in the apartment. He stated that no one came to fumigate or exterminate.

On cross-examination, Mr. Tamay was asked whether it was Zara Realty or a prior owner that he contacted about conditions after he moved in. He did not know and stated that he did not know if a new owner took over. However, he stated that it was always the same telephone number for his landlord. Mr. Tamay was asked about three (3) photographs of his apartment that were admitted into evidence. He stated that the tape he put on the windows was visible. He denied that cold air came through the air conditioning units depicted in two photographs and stated that he removed them in the winter. He stated that the photos did not depict the kitchen as it was before work was done on the floors. He could not recall when the work was done.

Mr. Tamay was next asked if he had a dog. He stated that he had one for about two (2) years after he moved in. He denied that the dog urinated in the kitchen or that dog urine ruined the floors. As for extermination, he denied that the landlord exterminated for cockroaches on October 21, 2022. When asked if his wife was there on that date, he stated that his wife was hardly there and that he and his daughter lived in the apartment at that time. He denied that his daughter let in an exterminator on that date.

3

[* 3]

Mr. Tamay was asked who he spoke with when he called Zara Realty. He replied that he spoke to someone named Rosa. When asked whether his landlord had maintenance request forms to request repairs, he replied that he had never seen one. In reference to the leaking in the bathroom, he could not recall when it occurred but stated that it was after he stopped paying rent. He stated that the leaking condition lasted for one day at most. As for the mold condition, he stated that they only cleaned it but that it was not properly repaired until later.

Mr. Tamay was asked about calling 311. He stated that he called to report conditions many times. He stated that he took temperature readings in the apartment when it was cold, but did not write them down or recall them. As for the cockroach condition, he stated that he had called Rosa and reported it to her. He denied ever seeing a sign-up sheet for extermination in the lobby of his building.

At the conclusion of cross-examination, Mr. Tamay was asked if he paid rent by check or money order. He stated that he paid by money order at the beginning of his tenancy. He confirmed the same on redirect. Respondents rested upon the conclusion of Mr. Tamay's testimony.

Petitioner called Elsa Tamay as its first rebuttal witness. Ms. Tamay testified that she moved into the premises in April 2017. She stated that Zara [Realty] was her landlord. She did not know who the landlord was before Zara, nor did she recall communicating with the old landlord. However, she stated that she made repair requests to Zara, but did not fill out maintenance requests. She was shown a written maintenance request from February 6, 2019 and acknowledged that it contained her handwriting. She confirmed that she filled it out. Nonetheless, she did not wish to correct her earlier testimony regarding maintenance requests. The February 6, 2019 maintenance request form was admitted into evidence. Ms. Tamay agreed

4

[* 4]

that the items included on the form had been repaired, although the self-closing door was broken a month later. She stated, however, that not everything in need of repair was included on the form.

Ms. Tamay was asked about more maintenance forms. She acknowledged her signatures on them but stated that the superintendent filled them out, and she just put her name and telephone number. She stated that she also told the superintendent about the windows, the kitchen floor, and doors. Additional maintenance forms were admitted into evidence after Ms. Tamay acknowledged her name on them. She acknowledged giving access for the repairs listed on the forms, including extermination for roaches on November 10, 2021. She stated that extermination was only done once. In reference to the photographs of the apartment that were admitted during Mr. Tamay's testimony. She testified that the photos showed the floors as they were at the time of her testimony; she stated that the floors had gotten better, then worse.

On cross-examination, Ms. Tamay was asked about photographs of the floor, which were admitted into evidence. She stated that the floor condition lasted from 2017 to 2020, and that the condition persisted, with gaps in the floor increasing, even after the landlord attempted to fix the condition. She stated that the floor condition was a tripping hazard. As for the windows not sealing properly, she stated that air comes through and causes the apartment to feel cold. Finally, she stated that the landlord had seen the windows several times.

Petitioner's second rebuttal witness was Arif Yacub. He testified that he is the superintendent of the subject building. He stated that extermination is offered in the building once a month and that a poster with sign-up sheet is posted in the lobby three days before each scheduled extermination. A series of posters with sign-up sheets for months in 2021, 2022, 2023, and 2024 were admitted into evidence. A final maintenance request form regarding repairs

5

[* 5]

for the subject premises on January 22, 2021 was admitted into evidence. He denied that Ms. Tamay requested any other work that was not listed in the maintenance request form.

On cross-examination, Mr. Yacub was asked about the extermination procedure. He stated that if the exterminator came in the morning, they would not return later if someone was not available. He denied that there was a mice and roach infestation on the first floor of the building. Regarding the repairs in the subject premises, he fixed the springs to the windows and walked through the kitchen. He acknowledged that the floor was retiled a month before his testimony. Petitioner rested on its rebuttal case at the conclusion of Mr. Yacub's testimony.

DISCUSSION/CONCLUSION

Elsa Tamay's first counterclaim is for breach of the warrant of habitability. The statutory warranty of habitability codified at Real Property Law (RPL) § 235-b(1) imposes a "covenant and warrant that the premises so leased or rented and all areas used in connection therewith . . . are fit for human habitation and for the uses reasonably intended by the parties and that the occupants of such premises shall not be subjected to any conditions which would be dangerous, hazardous or detrimental to their life, health or safety." If a breach of the warranty of habitability is proven, "the proper measure of damages for breach of the warranty is the difference between the fair market value of the premises if they had been as warranted, as measured by rent reserved under the lease, and the value of the premises during the period of the breach." (*Park W. Mgt. Corp. v Mitchell*, 47 NY2d 316, 329 [1979]). In making this determination, "the finder of fact must weigh the severity of the violation and duration of the conditions giving rise to the breach as well as the effectiveness of the steps taken by the landlord to abate those conditions." (*2590 35th St., LLC v Veleva*, 74 Misc 3d 130[A], 2022 NY Slip Op 50134[U], *2 [App Term, 2d Dept, 2d, 11th & 13th Jud Dists 2022]). To succeed on a warranty

6

of habitability claim, a tenant must also demonstrate that he or she provided access to make repairs (*see 150-15 79th Ave. Owners Corp. v James*, 31 Misc 3d 132[A], 2011 NY Slip Op 50606[U] [App Term, 2d Dept, 2d, 11th & 13th Jud Dists 2011]; *Callender v Titus*, 2004 NY Slip Op 50608[U] [App Term, 2d & 11th Jud Dists 2004]).

As an initial matter, Elsa Tamay's answer was interposed on January 21, 2021. The answer was not amended thereafter, and the court will not amend it sua sponte (*see Henry v Kingsberry*, 66 Misc 3d 143[A], 2020 NY Slip Op 50175[U], *2 [App Term, 2d Dept, 2d, 11th & 13th Jud Dists 2020]). Thus, any claim for damages for breach of the warranty of habitability will be limited to the period from the commencement of the tenancy in April 2017 through the date of the answer.[2] While the court took judicial notice of DHPD violations for the subject premises at trial, they were all issued after the date of the answer.

At trial, Jesus Tamay testified about multiple conditions in the subject premises. The court found his testimony to be credible regarding the improper sealing/closing of the windows starting in December 2017, his efforts to contact petitioner and/or its predecessor about the condition, and the lack of repairs. The court also credits his testimony and Elsa Tamay's testimony that the window condition caused the apartment to become cold. The court finds that the condition was repaired as of January 12, 2019, when Elsa Tamay signed off on a maintenance request form (in evidence), which acknowledged certain window repairs and stated that no other repairs were required. Accordingly, the court will award a 10% abatement for the window condition for 13 months (December 2017 through December 2018) and pro-rated 12 days in January 2019.

---

[2]     A breach of warranty of habitability claim is subject to a six-year statute of limitations (*see Garron v Bristol House, Inc.*, 162 AD3d 857, 858 [2d Dept 2018] [citing CPLR § 213(2)]).

7

[* 7]

As an abatement must be measured "by reference to the contract rent" (*Committed Community Associates v Croswell*, 171 Misc 3d 340, 343 [App Term, 2d Dept, 2d & 11th Jud Dists 1997], *affd* 250 AD 845 [2d Dept 1998]), respondent's damages will be calculated according to the rents contained in respondents' leases. From April 1, 2017 through March 31, 2018, the rent was $3,000.00 per month; from April 1, 2018 through March 31, 2020, the rent was $3,100.00 per month.[3] For December 2017 through March 2018, the monthly abatement (10% of $3,000.00 per month) is $300.00; multiplied by 4, the sum is $1,200.00. For April 2018 through December 2018, the monthly abatement (10% of $3,100.00 per month) is $310.00; multiplied by 9, the sum is $2,790.00. For 12 days in January 2019, the total rent due (pro-rated) was $1200.00. Thus, a 10% abatement for 12 days is $120.00. Taken together, the total abatement for the window condition ($1,200.00 + $2,790.00 + $120.00) is $4,110.00.

While respondents also testified about a floor condition, mold, and a cockroach infestation, the testimony lacked specificity as to the duration of those conditions. Moreover, petitioner's rebuttal evidence demonstrated petitioner's efforts to repair those conditions and Elsa Tamay's acknowledgements of repairs on maintenance request forms. Thus, the court declines to impose an abatement for any other condition.

Based on the foregoing findings and determinations, Elsa Tamay is granted a judgment for $4,110.00 against petitioner upon her warranty of habitability counterclaim (*see Croswell*, 171 Misc 3d at 343; *Amodeo v HVHC*, 31 Misc 3d 148[A], 2011 NY Slip Op 50982[U] [App Term, 2d Dept, 9th & 10th Jud Dists 2011]). The clerk shall issue a judgment accordingly (*see* CPLR § 411).

---

[3] Both amounts were preferential rents.

8

[* 8]

Elsa Tamay's second counterclaim was for an order to correct pursuant to Civil Court Act § 110(c) and NYC Admin. Code § 27-2121. As this court has found, respondents did not establish that any conditions constituting violations of the Housing Maintenance Code endured after the window condition was repaired in January 2019, the court dismisses the counterclaim for an order to correct, without prejudice to any claims to similar relief accruing after the interposition of the answer.

Elsa Tamay's third and final counterclaim was for rent overcharge. As the subject premises is rent stabilized, the overcharge claim is governed by the Rent Stabilization Law and Code. Since the alleged overcharge dates back to the commencement of respondents' tenancy, in April 2017, it is governed by pre-Housing Stability and Tenant Protection (HSTPA) [L 2019, ch 36, § 1]) law (*see Matter of Regina Metro. Co., LLC v New York State Div. of Hous. & Community Renewal*, 35 NY3d 332, 386 [2020] [hereinafter "*Regina*"]; *Austin v 25 Grove St. LLC*, 202 AD3d 429, 430 [1st Dept 2022]; *Bhawan 330 Realty LLC v Briones*, 85 Misc 3d 128[A], 2025 NY Slip Op 50175[U], * 2 [App Term, 2d Dept, 2d, 11th & 13th Jud Dists 2025]).[4] Under that law, "overcharge claims were subject to a four-year statute of limitations that precluded the recovery of overcharges incurred more than four years preceding the interposition of a claim[.]" (*Regina*, 35 NY3d at 352 [citing former Rent Stabilization Law (RSL) § 26-516(a)(2) and former CPLR § 213-a]).

As respondent interposed her answer on January 21, 2021, the base date [under pre-HSTPA law] for overcharge purposes is January 21, 2017 (*see Gomes v Vermyck, LLC*, 238

---

[4] While a recent Appellate Division, First Department decision, *Matter of West Pierre Assoc. LLC v Harvey*, 2025 NY Slip Op 04611, *1 [1st Dept 2025], allowed for recourse to the HSTPA amendments regarding overcharge [part F] "where no pre-HSTPA overcharge is alleged," the court finds that the core of the overcharge claim here is pre-HSTPA. While the HSTPA was passed before the answer was interposed, the leases and increases incorporated therein that comprise the purported overcharge were executed before the HSTPA's passage. While one lease became effective after the HSTPA's passage, the court does not find that the relevant amendments affect the ultimate outcome.

9

[* 9]

AD3d 26, 34 [2d Dept 2025]).  The DHCR Registration Apartment Information for the subject premises shows the last registered rent before the base date as $1,803.54, pursuant to a lease with the prior tenant, Melanie Marshall, running from October 1, 2014 through September 30, 2016. To the extent that the apartment was vacant on the base date, prior to the commencement of respondent's tenancy in April 2017, the base date rent is appropriately the prior legal regulated rent (plus any allowable increases) pursuant to Rent Stabilization Code (RSC) § 2526.1(a)(3)(iii) (9 NYCRR § 2526.1(a)(3)(iii)) (*see Matter of Segal v New York State Div. of Hou. & Community Renewal*, 2025 NY Slip Op 04654, *1 [2d Dept 2025] [Holding that the amended version of 9 NYCRR § 2526.1 applies to overcharge claims filed after the HSTPA's enactment where the apartment is vacant on the base date]).  Therefore, the court finds that the base date rent is $1,803.54, the prior registered rent before respondent's tenancy.

While petitioner sought to introduce proof of certain individual apartment improvements (IAIs) allegedly made in the apartment during the vacancy during its prima facie case, this court ruled that the proof was inadmissible (*see* Decision/Order dated February 8, 2024 – NYSCEF Doc. 89).[5]  Thus, at the time that respondents moved in, petitioner or its predecessor was only entitled to charge $1,803.54, plus a longevity increase of 6.6% (11 years multiplied by 0.6%) (*see Andrew Jackson Realty Co., L.P. v Patan*, 86 Misc 3d 127[A], 2025 NY Slip Op 50834[U] [App Term, 2d Dept, 2d, 11th & 13th Jud Dists 2025]) and a vacancy increase (for a one-year lease) of 18% (*see* former Rent Stabilization Law (RSL) § 26-511(c)(5a); Rent Guidelines Board [RGB] Order #48).  The resulting allowable legal rent at the time of respondents' vacancy lease was therefore $2,247.21.[6]  As respondents were charged $3,000.00 per month during their initial

---

[5]    The court notes that an Order of the Appellate Term, Second Department dismissed an appeal of the February 8, 2024 Decision/Order on September 23, 2024.
[6]    The longevity increase was $119.03 ($1,803.54 x 6.6%), added to the vacancy increase of $324.62 ($1,803.54 x 18%).

10

[* 10]

one-year lease term, they were overcharged by $752.79 each month, from April 2017 through March 2018. While the rent checks in evidence do not cover each month of the initial lease term, petitioner's ledger in evidence shows no prior balance as of January 1, 2020. Therefore, the court finds that respondents overpaid $9,033.48 during the initial lease term ($752.79 x 12).

According to the DHCR Registration Apartment Information, respondents' first renewal lease incorporated a monthly rent of $3,100.00, and ran from April 1, 2018 through March 31, 2020. At the time the renewal lease commenced, petitioner was only entitled to a 2% RGB renewal increase (*see* RGB Order #49). Thus, petitioner was legally permitted to charge $2,292.15 ($2,247.21 plus $44.94) per month during the term of the first renewal lease. Respondents therefore overpaid $807.85 each month of the renewal lease term. However, pursuant to the Rent Reduction Order issued under DHCR Docket No. HP110012B relating to insufficient furnishing of entrance door keys, respondents' rent was reduced to the "level in effect prior to the most recent guidelines increase for the tenant's lease which commenced before the effective date of [the] Order[.]" Additionally, no rent increases could be collected until a rent restoration order was issued.[7] Consequently, as of May 1, 2019, respondents' rent was reduced back to $2,247.21. From April 1, 2018 through April 30, 2019, respondents overpaid a total of $10,502.05 ($807.85 times 13 months). From May 1, 2019 through March 31, 2020, respondents' monthly overpayment was $852.79 ($3,100.00 minus $2,247.21). For eleven months, the total overpayment was $9,380.69. Therefore, for the entirety of the first renewal lease, respondents overpaid $19,882.74 ($10,502.05 plus $9,308.69).

---

[7]     No rent restoration order was issued through the date of Elsa Tamay's answer (*see* Order under DHCR Docket No. JP110014OR, dated December 13, 2021, denying petitioner's application to restore rent). Recently, the Appellate Division, Second Department affirmed the issuance of the original RRO (*see Matter of 57 Elmhurst, LLC v New York State Div. of Hous. & Community Renewal*, 2025 NY Slip Op 04172, *2 [2d Dept 2025]).

[* 11]

Respondents' second renewal lease ran from April 1, 2020 through March 31, 2021. The rent charged in the second renewal lease was $3,146.50 per month. Thus, respondents were overcharged $899.29 for each month of the second renewal lease ($3,146.50 minus the RRO-frozen rent of $2,247.21). The court notes that ERAP (New York State Emergency Rental Assistance Program) paid the entirety of the rent on respondents' behalf from April 2020 through the date of Elsa Tamay's answer (and for months thereafter). The overpayment from April 2020 through December 2020 was $8,093.61 and the pro-rated overpayment for January 2021 (through January 21, 2021) was $609.20 (68% [21/31] x 899.29), for a total overpayment of $8,702.81 for the period of the second renewal lease through the date of the answer (April 1, 2020 through January 21, 2021). Overall, respondents' overpayment from the commencement of the tenancy through the date of the answer was $37,619.03 ($9,033.48 plus $19,882.74 plus $8,702.81).

Pursuant to pre-HSTPA law, treble damages are appropriately imposed for willful overcharges for the two (2) years before the claim is filed (*see Hollis Realty Co. v Glover*, 179 Misc 2d 522, 525 [App Term, 2d Dept, 2d & 11th Jud Dists 1999] [citing the former R.S.C. § 2526.1(a)(2)(i)]). While respondent argues in its post-trial memoranda that Ms. Tamay is entitled to treble damages for the entirety of the overcharge period, the court does not find that the HSPTA amendments extending the applicability of treble damages apply here (s*ee Matter of Syllman v New York State Div of Hous. & Community Renewal*, 233 AD3d 977, 979 [Retroactive application of HSTPA amendments to assess overcharge damages is barred by *Regina*, while recourse to the amendments is permitted solely to calculate the legal regulated rent]; *2904 Atlantic Avenue LLC v Pauline Hoyte*, Index No. L&T 319412/22 [Civ Ct, Kings County, March 7, 2024, Jimenez, J. (NYSCEF Doc. 50)]). It is petitioner's burden to rebut the presumption of

12

[* 12]

willfulness (*see Matter of Sha Realty, LLC v. New York State Div. of Hous. & Community Development*, 193 AD3d 864, 375 [2d Dept 2021]; *Matter of South Lexington Associates, LLC v New York State Div. of Hous. & Community Development*, 170 AD3d 733, 734-735 [2d Dept 2019]). Here, the court does not find that petitioner met its burden. In the absence of the proof of the purported IAIs made prior to respondents' tenancy, petitioner presented no credible explanation justifying its charging and collecting rents well in excess of the permissible legal rent for the subject apartment. Moreover, petitioner's noncompliance with the RRO issued by DHCR is affirmative evidence of willfulness on its part (*see Diagonal Realty, LLC v Estella*, 73 Misc 3d 137[A], 2021 NY Slip Op 51117[U] [App Term, 1st Dept 2021]; *57 Elmhurst v Morales*, 82 Misc 3d 1243[A], 2024 NY Slip Op 50531[U] [Civ Ct, Queens County 2024]; *see also Cintron v Calogero*, 15 NY3d 347, 355-356 [2010]). Thus, the court will assess treble damages for the two (2) years immediately prior to the filing of Ms. Tamay's answer.[8]

Based on the court's calculations, respondents overpaid a total of $20,765.56 for the 2-year period prior to the date of the answer ($258.51 - 32% [10/31] of $807.85 overpayment for the pro-rated 10 days of January 2019, starting January 21, 2019, *plus* $2,423.55 overpayment from February 2019 through April 2019, *plus* $9,380.69 overpayment from May 2019 through March 2020, *plus* $8,702.81 overpayment from April 2020 through January 21, 2021). Treble damages for this period equal $62,296.68. For the overcharge preceding the 2-year treble damages award, the total from the commencement of the tenancy is $16,853.47 ($9,033.48 from April 2017 through March 2018, *plus* $7,270.65 from April 2018 through December 2018, *plus* $549.34 – 68% [21/31] overpayment pro-rated 21 days of January 2019). Taken together, the

---

[8]        To the extent that a portion of the overcharges occurred before petitioner's ownership, there is a presumption of carryover liability to a successor owner, which petitioner does not rebut here (*see Le Bihan v 27 Wash. Sq. N. Owner LLC*, 205 AD3d 616, 617 [1st Dept 2022]; *see also Matter of 197 Madison Holdings LLC v New York State Div. of Hous. & Community Renewal*, 231 AD3d 440, 441 [1st Dept 2024]).

13

[* 13]

total overcharge damages are $79,150.15.  A judgment shall be issued in favor of Elsa Tamay upon her overcharge counterclaim in the amount of $79,150.15.  This shall be in addition to the judgment issued for the warranty of habitability counterclaim.  Enforcement of both judgments shall be stayed to August 31, 2025.  There shall be no stay of enforcement after August 31, 2025.  Respondents' attorneys shall notify the New York State Office of Temporary and Disability Assistance (OTDA) of this court's determination, and file proof of such notification to NYSCEF no later than 21 days from the date of this Decision/Order.  While the court awards Elsa Tamay damages for rents paid by OTDA in furtherance of the "statutory purposes of discouraging overcharges and encouraging prompt repayment of overcharge amounts" (*Matter of London Terrace Gardens L.P. v New York State Div. of Hous. & Community Renewal*, 149 AD3d 521, 521 [1st Dept 2017]), OTDA's interest in properly administering the ERAP program requires such notification.

This Decision/Order will be filed to NYSCEF.  The parties are directed to pick up their exhibits or they may be destroyed at the court's discretion in compliance with DRP-185.  The exhibits will be transferred back to Queens County Housing Court as expeditiously as possible. While this court adjourned the companion failure to renew holdover proceeding, Index No. L&T 320054/22, with the instant proceeding, it will now be restored to a trial Part in Queens County for appropriate proceedings.

THIS CONSTITUTES THE DECISION AND ORDER OF THE COURT.

Dated:  New York, New York
      August 19, 2025                 _____
                                HON. CLINTON J. GUTHRIE
                                J.H.C.

**APPROVED**
CGUTHRIE , 8/19/2025, 9:24:35 AM

14

[* 14]